# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ONONDAGA

——————————————————————————X

JOHN DOE

Plaintiff(s),

- vs -

SYRACUSE UNIVERSITY

Defendant(s).

——————————————————————————X

**SUMMONS**

Index No.: _____

Date Index No. Purchased

_____

To the Person(s) Named as Defendant(s) Above:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the Plaintiff(s) herein and to serve a copy of your answer on the Plaintiff(s) at the address indicated below within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: __November 21__ , __2023__

*/s/ Jonathan D. Lindenfeld*
Signature

Jonathan D. Lindenfeld
Print name

Address and Phone Number:

FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
( 332 ) 216 - 2101

Defendant's Address: 900 South Crouse Avenue, Syracuse, New York 13244

Venue: Plaintiff(s) designate(s) __Onondaga__ County as the place of trial. The basis of this designation is *(check one)*:

☐ Plaintiff(s) reside in _____ County.
☒ Defendant(s) reside in __Onondaga__ County.
☐ Other *(describe)*: _____

**<u>NOTE</u>: THIS FORM OF SUMMONS MUST BE SERVED WITH A COMPLAINT**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ONONDAGA**
------------------------------------------------------------------X
**JOHN DOE,**

                           **PLAINTIFF,**                   **INDEX NO.:**

       **-AGAINST-**

**SYRACUSE UNIVERSITY,**

                          **DEFENDANT.**
------------------------------------------------------------------X

### COMPLAINT

Plaintiff John Doe ("Plaintiff" or "John"), by and through his attorneys, Fegan Scott LLC, for his Complaint against Defendant Syracuse University ("Syracuse"), alleges as follows:

## I.    INTRODUCTION

1.    For years, Syracuse created a safe harbor for Conrad Mainwaring ("Mainwaring"), a serial predator who used his position of trust as a doctoral student in Syracuse's Psychology Department; as a Residential Hall Deputy Director and Dorm Counselor ("Dorm Counselor"); and as a track and field coach to prey on Syracuse students, including Plaintiff.

2.    Syracuse provided Mainwaring an on-campus apartment in the dormitory known as Brewster Hall, and later Watson Hall, which Mainwaring used to groom and sexually abuse scores of male students at Syracuse under the guise of providing therapy.

3.    Syracuse knew or should have known of Mainwaring's predatory behavior given the long-line of male students visiting his on-campus apartment, his conspicuous, inappropriate socializing with students he was supervising, complaints from Mainwaring's victims (including the year before Plaintiff attended Syracuse), and steps Mainwaring took to isolate and control his victims with Syracuse's blessing, such as moving Plaintiff from a double-person dorm room to a

single-person dorm room.

4.     Even after receiving complaints about Mainwaring's inappropriate behavior, Syracuse took no action to stop Mainwaring from targeting and abusing male Syracuse students, including Plaintiff. Instead, Syracuse facilitated Mainwaring's actions by continuing to allow him to live in and exercise responsibility over on-campus housing with authority over male students, including Plaintiff; holding him out at an assistant track and field coach, which gave him access to other victims; and blessing Mainwaring's decision to move Plaintiff to a single room to ensure that Plaintiff was isolated so the abuse could continue. In addition to creating a safe harbor for Mainwaring, Syracuse created safe passage for him when he left.

5.     Syracuse's safe harbor and safe passage for Mainwaring are part of a culture of cover-up and turning a blind eye to complaints of sexual abuse on the Syracuse campus.

6.     This action is brought pursuant to the New York Adult Survivors Act ("ASA"), CPLR § 214-J, as it alleges physical, psychological, and emotional injuries and damages suffered as a result of conduct that constitutes sexual offenses as defined by § 130 of the New York Penal Law committed against a person who is eighteen years of age or older.

7.     Pursuant to the ASA, Plaintiff timely brings his causes of action within the retroactive revival window, open through November 23, 2023, which removes the previously-applicable statute of limitations.

8.     Pursuant to the ASA, Defendant is liable for the negligent acts and omissions which resulted in Plaintiff being a victim of sexual abuse and suffering serious physical, psychological, and emotional harms.

## II.     PARTIES

9.     Plaintiff John Doe is a citizen of the United States and resident of Vienna, Austria. Plaintiff attended Syracuse during the school years 1982-83 and 1983-84 and lived in

2

Brewster Hall, 401 Van Buren Street, Syracuse University.

10.     Defendant Syracuse University is a private educational university doing business and employing individuals in the City of Syracuse, County of Onondaga, and State of New York. Syracuse's principal place of business is located at 900 South Crouse Avenue, Syracuse, New York 13244.

### III.     JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendant pursuant to CPLR § 301 and § 302, in that the Defendant has a principal place of businesses within the State of New York, transacts business, and contracts to supply services within the State of New York and committed tortious acts within the State of New York.

12.     This Court has jurisdiction over this action because the amount of damages Plaintiff seeks exceed the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

13.     Venue for this action is proper in the County of Onondaga pursuant to CPLR § 503, in that the Defendant Syracuse University resides in this County.

### IV.     CPLR § 1603 – NO APPORTIONMENT OF LIABLITY

14.     To the extent Defendant pleads such a defense, pursuant to CPLR § 1603, the causes of action alleged herein are exempt from the operation of CPLR 1601 by reason of one or more of the exemptions provided in CPLR 1602, including but not limited to CPLR § 1602(2), (5), (7), and (11), thus precluding Defendant Syracuse University from limiting its liability by apportioning some portion of liability to any joint tortfeasor.

### V.     STATEMENT OF FACTS

#### A.  John's future was bright when he started at Syracuse.

15.     In the early 1980s, John was an intelligent, athletic, and creative high school

3

student, whose future was bright. He was awarded a regional academic scholarship to attend

college, and his academic goal was to ultimately pursue a Ph.D. degree.

16.     John enrolled and began his freshman year at Syracuse in the Fall of 1982, when

he was 18 years old. While John missed his girlfriend back home, he was excited about the

opportunities available to him at Syracuse. He quickly joined multiple extracurricular activities

and clubs and walked on to one of Syracuse's Division I athletic teams. He felt like his whole

life had opened up before him and its possibilities were endless.

**B. A Syracuse Hall Deputy Director and Dorm Counselor, Conrad Mainwaring, abused his position of power and trust and sexually abused and molested John and other male students.**

17.     Syracuse assigned John to live in on-campus housing in a dormitory room located

in Brewster Hall, 401 Van Buren Street, Syracuse University. John was assigned a "double"

room that he shared with a roommate.

18.     Brewster Hall was an all-male dorm which housed approximately 450 students,

the majority of which were freshman. Brewster was connected to Boland Hall, an all-female

dorm, via a common lobby.

19.     Syracuse employed Conrad Mainwaring as a Deputy Director of Brewster Hall

and Dorm Counselor ("Dorm Counselor"). Mainwaring was also a doctoral student in Syracuse's

Psychology Department.

20.     As Syracuse's Dorm Counselor for Brewster Hall, Syracuse provided Mainwaring

with an apartment on the ground floor of Brewster Hall, accessible off the lobby shared by both

Brewster and Boland Halls.

21.     As Syracuse's Dorm Counselor for Brewster Hall, Mainwaring bounced around

between the dining hall, lobby, and other public areas, talking to students, charming them with

his British accent, and boasted a storied career of competing in the Olympics, being a member of

4

the Royal Academies of Dance and Music, possessing an advanced Black Belt, and engaging in cutting-edge psychological research at Syracuse.

22.     During the first few weeks of school, John was in the Brewster Hall lobby. John could feel the presence of someone behind him. He quickly turned to see who was in his personal space.

23.     Standing there was Mainwaring, who said in his British accent, "Very good, you're reflexated [sic]," which John understood to be a compliment for recognizing and instinctually reacting to Mainwaring's presence. Curious about Mainwaring's accent, John asked where he was from and Mainwaring began boasting of his success as an Olympic athlete for the United Kingdom.

24.     Over the next week, John regularly bumped into Mainwaring, which seemed coincidental at the time. With hindsight, John recognizes that Mainwaring learned his schedule and was stalking him.

25.     During the first month of his freshman year, John saw Mainwaring in the Brewster Hall lobby. Mainwaring invited John to follow him to a private office located on the Boland Hall side of the building in the hallway leading to Brewster-Boland's Director's apartment.

26.     In this Syracuse office, Mainwaring had John sit behind the desk and proceeded to ask John questions about his life, hopes, dreams, and ambitions. Mainwaring interviewed John and told him he was "passing the test" with each answer. Mainwaring leaned in and seemingly took a deep personal interest in John, providing affirmation that John was intelligent and interesting.

27.     Mainwaring claimed to be conducting cutting-edge research at Syracuse and told

5

John that he could be the beneficiary of that research. Mainwaring offered to help John achieve his hopes and dreams and painted a canvas of success for John's future as an athlete, as a student, and as a person. John was charmed by Mainwaring's charisma, and Syracuse's imprimatur of Mainwaring in his role as a Dorm Director and a doctoral candidate convinced John that Mainwaring could indeed help him succeed in college and beyond.

28.     Eventually, Mainwaring veered the conversation to the effects of exposure to male nudity and specifically the penis on human subconscious states and on John's subconsciousness. Mainwaring asked John how he viewed his own attractiveness and asked him the size of his penis. After John hesitated, Mainwaring pushed him to commit to an answer, implying John was mentally weak and acting naively with his discomfort about the subject. He further suggested that John would fail the test if he equivocated, and that Mainwaring would not share the fruits of his research with John. John quickly came to believe that Mainwaring's every question (and later every touch) was a test of John's motivation and strength – and only if John passed these tests would Mainwaring share his research with John, which John became convinced was essential to his success.

29.     John left the first meeting with Mainwaring feeling validated that a Syracuse official and adult, his Dorm Counselor, a doctoral candidate, and an Olympian, could see success in his future if he dedicated himself to follow Mainwaring's teachings.

30.     Within the next week or two, Mainwaring invited John into his one-bedroom apartment located in Brewster Hall for further discussion about John's future. During their discussion, Mainwaring told John he was a trained psychotherapist, physiotherapist, and massage therapist, and could help John with his physical and mental training, all of which would be essential to succeed at Syracuse and beyond. Furthermore, Mainwaring guaranteed John would

6

Case 5:23-cv-01466-FJS-TWD   Document 1-1   Filed 11/22/23   Page 9 of 23

attain all of his goals and dreams if, and only if, John would completely trust Mainwaring and completely adhere to Mainwaring's regimen.

31.     Based on Mainwaring's explanation and the skills he professed, John believed Mainwaring was offering a wealth of esoteric knowledge and training skills to provide John with legitimate clinical treatment, and John was thrilled that Mainwaring had singled out John for such an honor.

32.     Mainwaring told John he needed to conduct a test under the guise of Mainwaring's clinical regimen. Mainwaring had John lie down fully-clothed on one of his two single beds, where he proceeded to give him a massage.

33.     Given Mainwaring's Olympic success, training as a physiotherapist and massage therapist, and position as Dorm Counselor, John trusted Mainwaring. During the massage, Mainwaring's forearms started to brush against John's penis. Mainwaring's touching around John's penis became more deliberate, and eventually Mainwaring began stroking John's penis through his clothes. While John's physical reflexes caused him to develop an erection, he was not mentally or emotionally aroused by Mainwaring's touch. John was embarrassed and wanted Mainwaring to stop but was frozen and scared to offend him.

34.     Mainwaring's insistent strokes began hurting John and he told Mainwaring he felt uncomfortable. John expressed his embarrassment that he had developed an erection, as if it were John's fault that the stroking had caused an erection. Mainwaring called John an idiot, told him he had a "massive erection," and berated John for waiting so long to say anything to stop Mainwaring. This confirmed in John's mind that Mainwaring was conducting a legitimate psychological test, and John thought he had failed the test because he had delayed in telling Mainwaring to stop.

7

35.     Mainwaring's approval of John was so important, and John felt defeated that he had failed his first test as part of Mainwaring's regimen.

36.     The next time Mainwaring told John he needed to be tested in his apartment, John was determined to pass whatever test Mainwaring presented because he so wanted to learn from Mainwaring and to be a recipient of Mainwaring's clinical research. John wanted the future that Mainwaring had painted of success in life.

37.     During the next test, Mainwaring removed John's pants and grabbed his penis. Mainwaring stroked John's penis to the point that it became inflamed and chaffed. John told Mainwaring that it was hurting. Mainwaring stopped and told John he was failing the test, playing up John's discomfort and treating John as weak and naïve. Mainwaring said that he did not know if John had enough mental fortitude to for Mainwaring to work with him, or to be successful. John was devastated. John felt that he was failing the most important audition of his life. Here again, John believed that Mainwaring was offering legitimate physical and mental training.

38.     After this meeting, Mainwaring continued to use his position of power and authority to repeatedly sexually assault, abuse, and molest John in Mainwaring's Syracuse-provided apartment in Brewster Hall under the guise of clinical mental and physical treatment.

39.     Mainwaring would remove John's clothes and challenge him to ejaculate while Mainwaring masturbated him. John could not do so without keeping his eyes closed, fantasizing about women, and ignoring the reality of the sexual abuse (which he did not realize was abuse until years later). Mainwaring's approval was extremely important to John, and John believed that he was passing these tests that Mainwaring put in in front of him.

40.     As the tests continued (which John believed at the time were legitimate, clinical

8

tests, but in reality was sexual abuse), Mainwaring's abuse escalated and he demanded more and

more secrecy from John. As part of this secrecy, there were times when Mainwaring made John

enter his on-campus apartment through an outside window so as not to be detected.

41.     Mainwaring also isolated John from what was left of his support network. For

example, Mainwaring arranged for Syracuse to move John to a different dorm room in Brewster

Hall without a roommate. John was guided by Mainwaring and agreed to move into a "single"

room on a different floor, losing the friendships he had made on his original floor. Mainwaring

would tell John who in Brewster Hall he could talk to and told him that he was not permitted to

talk to anyone else.

42.     Also, Mainwaring told John that his training would not be successful if he

"French"-kissed his girlfriend or engaged in sexual touching with her. He forbid John from

masturbating or even fantasizing about girls, and even speaking to girls. He told John that John

needed to be disciplined to be successful, and could not be distracted by girls, parties, drugs, or

drinking.

43.     Mainwaring instructed John to talk only to the other male students who were also

part of Mainwaring's "training" program, dubbed "the Squad." The fact that there were a group

of other males undergoing training, like John, furthered John's belief that that what Mainwaring

was doing was legitimate since others knew about it and participated in it. Mainwaring made

sure that the Squad members were John's only friends.

44.     By the end of his first semester, John was a completely different person than the

bright-eyed, eager, and curious freshman who had joined multiple different Syracuse teams and

clubs. He was isolated and alone, without friends or a roommate, and trying to avoid spending

time alone with his girlfriend even though he wanted to. He felt numb and could barely get out of

9

bed. He skipped class and was failing most of them.

45.     By second semester, John had dropped out of all the extra-curricular activities, including the athletic team he was on. He felt that joy and happiness had left him, he could not focus, and was having panic attacks.

46.     John was stuck in a cycle of what he thought was clinical treatment that would help him succeed, but it was nothing more than sexual abuse and touching by Mainwaring (only realized years later) to which he did not consent. John loathed himself as a result.

47.     Because Mainwaring was an adult in a position of power over him and John believed Mainwaring to be a legitimate authority figure at Syracuse, John believed the sexual abuse was part of legitimate treatment that Mainwaring was providing based on his clinical training and experience. Mainwaring had brainwashed John into believing that he needed to pass Mainwaring's tests to be a success in life. John did not, because he could not, consent to any of the criminal sexual misconduct forced on him by Mainwaring.

48.     At the end of his freshman year, John felt dejected and defeated and rejected Mainwaring's contact. Mainwaring retaliated against him, cutting him off from all interpersonal relationships by telling the other Squad members they could no longer be friends with John. Mainwaring demonstrated to John that he completely controlled John's life and happiness. Only after John's persistence did Mainwaring eventually let John return to the Squad, albeit "on probation."

49.     In his sophomore year, Mainwaring encouraged John to join the track team as a way for Mainwaring to gain further control over John. Mainwaring was an assistant coach of Syracuse's track and field team. John complied, tried out for the team, and earned a spot on the roster. There were a number of Squad members on the track team, who came to Mainwaring's

10

Syracuse apartment for "physio- or psycho-therapy," both of which John now understands were a masquerade for sexual abuse.

50.     The cycle of abuse continued through John's sophomore year in Mainwaring's Syracuse-provided apartment, which was now located in Watson Hall.

51.     Believing that Mainwaring was treating him clinically, John never attempted to physically fight off Mainwaring or stop his actions while John was being sexually assaulted.

52.     The abuse took a devastating toll on John, negatively impacting his mental health and ability to focus on his studies. At the end of his sophomore year, Syracuse sent John a letter, putting him on academic probation and forcing him to take a year off school. No one from Syracuse investigated why John was failing.

### C. Mainwaring's abuse, perpetuated as a result of Syracuse's failings, profoundly harmed John.

53.     Unlike when he began at Syracuse, at the end of his sophomore year, John hated himself. As a result of the abuse and Syracuse's decision to force him from school, John suffered from devastating panic attacks. He felt his life was out of control and that all of his potential and opportunities were gone. He felt he had no future and that he was dead inside.

54.     John felt his psyche had split in two from the abuse. In order to survive, he felt like he was on the outside of his body looking in, disjointed, and disconnected from his physical self.

55.     Similar to many victims of sexual assault, John continued contact with Mainwaring, convincing himself that he was not being sexually abused but instead was receiving therapy from Mainwaring that promised to put him on the path to success. John believed that he needed to remain "mentally tough" through the tests Mainwaring had presented as therapy and training. This was essential for John to become a success in all aspects of his life, like

Mainwaring purported to be, and like Syracuse held Mainwaring out to be.

56.     Years later, when he hit rock bottom, John turned to Mainwaring for help, who he thought was his psychotherapist. But instead of providing help, Mainwaring instructed John to commit suicide. Mainwaring pressured John to take the next step and end his life. Mainwaring's direction and advice caused John to contemplate different ways to kill himself.

57.     At another time, Mainwaring again encouraged John to commit suicide. Mainwaring told John there was nothing more he could do to help him. Mainwaring told John he should see a therapist. John was astounded and told Mainwaring he thought Mainwaring was his therapist. Quickly realizing he had made a mistake, Mainwaring told John that he should not share with any other therapist John's prior "work" or "therapy" with Mainwaring. Mainwaring told John that he should "run" from and avoid any future therapist that asked about prior therapy. Mainwaring emphasized the importance of keeping silent about prior "therapy" with Mainwaring. Mainwaring said, "If you talk about your prior therapy, you will ruin any benefit of future therapy."

58.     Mainwaring had a ready response for any question John asked, and it was only years later that John could understand that he was so completely brainwashed and manipulated by Mainwaring, in addition to being sexually and emotionally abused.

59.     For decades following the abuse, and as a direct result of the abuse and Syracuse's failures, John suffered serious physical, emotional, and psychological injuries. He drifted through life. He did not finish college. He did not care about himself and did not take care of himself. John could not maintain healthy relationships with women and had difficulties maintaining a steady job. Only after decades of therapy, and at the final hour under the New York Adult Survivors Act, is John able to bring this lawsuit to seek damages because of his

injuries due to Syracuse's actions in providing a safe harbor, and then a safe passage, for Mainwaring.

### D. Syracuse was on notice of the abuse through complaints and Mainwaring's actions.

60.     Prior to, and throughout the time that Mainwaring perpetrated criminal sexual misconduct against Plaintiff, Syracuse University expressly and impliedly represented to Plaintiff and other students that Mainwaring was a safe and qualified advisor, Dorm Counselor, athletic coach, and/or athletic trainer.

61.     John reasonably trusted and believed that Syracuse was a safe environment for him to be in with regard to Syracuse employees, including Mainwaring, and that he would not be harmed as a student or athlete.

62.     Prior to Mainwaring perpetrating criminal sexual acts against Plaintiff, Syracuse knew or should have known that Mainwaring was engaging in predatory grooming, inappropriate touch, and sexual misconduct against students at Syracuse and/or other institutions where Mainwaring was previously an employee and/or volunteer.

63.     Prior to Mainwaring perpetrating criminal sexual acts against Plaintiff, Syracuse knew or should have known that Mainwaring was taking young underclassman to meet privately one-on-one in his Brewster Hall apartment to participate in "counseling" sessions that led to sexual assault and sexual abuse.

64.     Prior to Mainwaring perpetrating criminal sexual acts against Plaintiff, Defendant had actual knowledge of Mainwaring's inappropriate conduct, proclivities, grooming behaviors, and predatory acts against young men, yet failed to take any reasonable measures to protect Plaintiff and other students against the foreseeable harms.

65.     The long line of male students entering a Dorm Counselor's apartment in a

13

Case 5:23-cv-01466-FJS-TWD   Document 1-1   Filed 11/22/23   Page 16 of 23

Syracuse dorm, both day and night, should have put Syracuse on notice that Mainwaring was abusing his position of authority or, at a minimum, should have warranted an investigation.

66. In fact, Mainwaring should not have held the position of Dorm Counselor in the Fall of 1982 when John started as a freshman. Based upon information and belief, during the prior school year, 1981-82, Mainwaring had preyed on at least one other male student in Brewster Hall who reported the incident to Syracuse authorities. However, Mainwaring painted the complainant as a "pathological liar," and Syracuse failed to terminate Mainwaring or even take lesser actions to ensure that Mainwaring did not isolate or abuse other students. Rather, Syracuse facilitated Mainwaring's behavior, including by allowing Mainwaring to move John into a dorm room without a roommate.

67. Had Syracuse taken action based on the student's complaint the year before John started at Syracuse, John would not have been sexually abused.

68. The institutional failures of Syracuse created circumstances that made it reasonably foreseeable that the sexual misconduct perpetrated against Plaintiff would likely occur.

69. On Syracuse property, Mainwaring, acting on behalf of Syracuse and in his capacity as an employee in a supervisory role over students and as a coach of the track and field team, committed violations of Article 130 of the New York Penal Law, including but not limited to the following sections: §§ 130.20, 130.52, 130.65.

70. As a direct and proximate cause of Syracuse's intentional and negligent acts and omissions, Plaintiff suffered, and continues to suffer, serious psychological, physical, and emotional harms.

**COUNT I – NEGLIGENCE**

71. Plaintiff repeats and realleges by reference each and every allegation set forth

14

above as if fully set forth herein.

72.    At all relevant times, Syracuse, its agents and/or employees, had a duty to
Plaintiff, as one of its students, to reasonably guard against and/or intervene to stop the
foreseeable harms that resulted in Plaintiff's injuries.

73.    At all relevant times, Syracuse, its agents and/or employees, had an opportunity to
intervene and prevent the sexual abuse perpetrated against Plaintiff and failed to do so.

74.    Prior to sexual abuse perpetrated against Plaintiff as described herein, Syracuse,
its agents and/or employees, knew or should have known of Mainwaring's propensity for the
sexual abuse perpetrated against Plaintiff.

75.    At all relevant times, Syracuse, its agents, employees, and/or contractors had a
duty to Plaintiff and similarly situated students to use the same degree of care as a reasonably
prudent parent would use to provide a safe and secure school environment free from foreseeable
harms.

76.    At all relevant times, Syracuse, its agents, employees, and/or contractors
negligently, recklessly, and carelessly breached its duty owed to Plaintiff to provide reasonable
care and ensure a safe and suitable living and educational environment, including, but not limited
to, the following:

        a.    Syracuse failed to institute and/or implement and execute proper policies
              and procedures to ensure the safety of its students living on campus in its
              care, custody, and control;

        b.    Syracuse failed to institute and/or implement and execute proper policies
              and security measures that would have prevented Mainwaring from freely
              engaging in isolated, one-on-one interactions with students that resulted in

15

foreseeable sexual abuse occurrences;

c.      Syracuse failed to properly notify, train, and otherwise educate students and employees concerning the impropriety of sexual and non-sexual touching; sexual relations with students; and proper identification and intervention of foreseeable sexual abuse occurrences;

d.      Syracuse failed to create and/or follow safety protocols and any corresponding and related rules, regulations, policies, practices, and procedures that would have discovered, prevented, and/or intervened the causes of action that resulted in Plaintiff's injuries;

e.      Syracuse failed to properly investigate reports of misconduct perpetrated by Mainwaring; and

f.      Syracuse failed to report and notify the proper authorities upon discovery and notification of Mainwaring's sexual abuse.

77.     Syracuse breached the above duties owed to the Plaintiff and was otherwise negligent.

78.     Syracuse's acts and omissions showed a reckless or willful disregard for the safety and well-being of Plaintiff and other students.

79.     As a result of Syracuse's conduct described herein, Plaintiff has and will continue to suffer personal, physical, and psychological injuries, including but not limited to great pain of mind and body; severe and permanent emotional distress; physical manifestations of emotional distress; problems sleeping and concentrating; low self-confidence, low self-respect, and low self-esteem; feeling of worthlessness, shamefulness, and embarrassment; feeling alone and isolated; losing faith in authority figures; struggling with gainful employment and career

16

advancement; feeling helpless and hopeless; problems with sexual intimacy; relationship problems; trust issues; feeling confused and angry; depression; anxiety; feeling dirty, used, and damaged; having traumatic flashbacks; and feeling that his youth and innocence was stolen. Plaintiff was prevented and will continue to be prevented from performing Plaintiff's normal daily activities; has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling; and, on information and belief, has incurred and will continue to incur loss of income and/or loss of earning capacity.

80.    As a result of the foregoing, Plaintiff was injured wholly as a result of the negligence, carelessness, and recklessness of Syracuse without any negligence on the part of the Plaintiff contributing thereto.

### COUNT II - NEGLIGENT HIRING, SUPERVISION, RETENTION, AND/OR DIRECTION

81.    Plaintiff repeats and realleges by reference each and every allegation set forth above as if fully set forth herein.

82.    At all times herein, Syracuse hired Mainwaring for positions that required him to work closely with, mentor, supervise, and counsel its students.

83.    Syracuse was negligent in hiring Mainwaring because Syracuse knew or should have known, through the exercise of reasonable care, of Mainwaring's propensity to develop inappropriate relationships with students and to engage in sexual behavior and lewd and lascivious conduct with such students.

84.    Mainwaring would not and could not have been in a position to sexually abuse Plaintiff had Mainwaring not been hired by Syracuse to mentor, teach, supervise, and counsel students.

85.    Mainwaring sexually abused Plaintiff on Syracuse property.

17

86.     The harm complained of was foreseeable.

87.     Plaintiff would not have suffered the foreseeable harm complained of herein but for the negligence of Syracuse in having placed Mainwaring in the Dorm Counselor position and allowing Mainwaring to remain in that or similar positions on the Syracuse campus.

88.     At all times while Mainwaring was employed or appointed by Syracuse, he was supervised by Syracuse or its agents and employees.

89.     At all times while Mainwaring was employed or appointed by Syracuse, he was under the direction of Syracuse or its agents and employees.

90.     Syracuse was negligent in its direction and supervision of Mainwaring in that it knew or should have known, through the exercise of ordinary care, that Mainwaring's conduct would subject third parties to an unreasonable risk of harm, including Mainwaring's propensity to develop inappropriate relationships with students and to sexually abuse them.

91.     Syracuse failed to take steps to prevent such conduct from occurring.

92.     Syracuse was negligent in their retention of Mainwaring in that it knew, or should have known, through the exercise of reasonable care, of Mainwaring's propensity to develop inappropriate relationships with students and to sexually abuse them.

93.     Syracuse retained Mainwaring in his positions as Dorm Counselor, mentor, supervisor, and counselor to such students, including Plaintiff, and thus left Mainwaring in a position of power  and authority to continue the sexual abuse.

94.     Syracuse failed to take reasonable steps to prevent such events from occurring on Syracuse's premises.

95.     Mainwaring would not and could not have been in a position to sexually abuse Plaintiff had he not been negligently retained, hired, supervised, or directed by Syracuse as a

18

Dorm Counselor, mentor, supervisor, and counselor to Plaintiff and other students.

96.     Syracuse breached its duty of care to Plaintiff and was otherwise negligent.

97.     As a result of the foregoing, Plaintiff was injured wholly as a result of the negligence, carelessness, and recklessness of Syracuse without any negligence on the part of the Plaintiff contributing thereto.

98.     As a direct or indirect result of said conduct or negligence, Plaintiff has suffered the injuries and damages described herein.

### COUNT III - NEGLIGENT SECURITY

99.     Plaintiff repeats and realleges by reference each and every allegation set forth above as if fully set forth herein.

100.    Syracuse negligently failed to provide adequate security to Plaintiff while Plaintiff was a student assigned by Syracuse to live in Brewster Hall and thus lawfully within the premises.

101.    Syracuse negligently failed to provide adequate security to Plaintiff while Plaintiff was lawfully within and living in Brewster Hall and while Syracuse had knowledge of Syracuse employee Conrad Mainwaring's propensity for the type of behavior which resulted in Plaintiff's injuries.

102.    Syracuse negligently failed to safeguard Plaintiff John Doe, as a freshman and sophomore student at Syracuse, by putting Mainwaring in a position to cause foreseeable harm, which most likely would not have occurred had Syracuse taken reasonable care in safeguarding Plaintiff.

103.    Syracuse knew or should have known of Mainwaring's propensity for the conduct that caused Plaintiff's injuries and negligently failed to take reasonable measures to protect and provide security to Plaintiff and other male students at Syracuse, including residents in Brewster

19

Hall.

104.    Plaintiff's injuries were the result of the negligence and carelessness of Syracuse in the ownership, operation, management, maintenance, control, security and supervision of Brewster Hall and employees within the premises, including Mainwaring.

105.    As a result of the foregoing, Plaintiff was injured wholly as a result of the negligence, carelessness, and recklessness of Syracuse without any negligence on the part of the Plaintiff contributing thereto.

106.    As a direct or indirect result of said conduct or negligence, Plaintiff has suffered the injuries and damages described herein.

WHEREFORE, Plaintiff respectfully requests that the Court grant judgment in this action in favor of the Plaintiff and against Syracuse in a sum of money in excess of the jurisdictional limits, together with all applicable interest, costs, disbursements, punitive damages, and such other, further, and different relief as the Court in its discretion shall deem to be just, proper, and equitable.

Plaintiff further places Syracuse on notice and reserves the right to interpose claims sounding in Fraudulent Concealment, Deceptive Practices and/or Civil Conspiracy should the facts and discovery materials support such claims.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 21, 2023                    FEGAN SCOTT LLC

By: */s/ Jonathan Lindenfeld*
Jonathan Lindenfeld
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

20

Elizabeth A. Fegan
(*pro hac vice forthcoming*)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Lynn Ellenberger
(*pro hac vice forthcoming*)
FEGAN SCOTT LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Phone: 412.346.4104
Fax: 312.264.0100
lynn@feganscott.com

*Counsel for Plaintiff*

21